WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Verco Decking, Inc., | No. CV-11-2516-PHX-GMS |
| Plaintiff/Counterclaim-Defendant, | **ORDER** |
| vs. | |
| Consolidated Systems, Inc., | |
| Defendant/Counterclaim-Plaintiff. | |

Pending before this Court are the briefs addressing claim construction.[1] (Docs. 65, 71–77, 91, 94.) Also before the Court is Motion to Modify Expert Report Deadlines and Related Deadlines in the Case Management Order. (Doc. 97) For the reasons set forth below, the Court makes the following construction and interpretation of the meaning of the disputed claims. Good cause appearing, the Motion to Modify is also granted in part according to the deadlines ordered below.

## BACKGROUND

In this patent suit, Verco Decking, Inc. ("Verco") alleges that Consolidated Systems, Inc. ("CSI") infringed Patents No. 6,212,932 ("the '932 Patent") and 6,397,469 ("the '469 Patent"). (Doc. 1.) The '932 Patent is a device patent covering a tool used to form structural louvers, and the '469 Patent is a method patent covering, *inter alia*, the

---

[1] The request for oral argument is denied because the parties have thoroughly discussed the law and the evidence, and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

1    use of the '932 tool to secure workpieces together. (*Id.*) Verco's patents cover its Punchlok tool, which secures together panels of structural steel decking to form commercial buildings strong enough to withstand forces such as seismic activity and high winds. (Doc. 73 at 1.) Verco alleges that CSI's competing product, the Dek-lok ISL tool, infringes on the '932 Patent, and that the use of that tool infringes on the '469 Patent.

The U.S. Patent and Trademark Office ("PTO") issued the '932 Patent on April 10, 2001, and the '469 Patent on June 4, 2002. (Doc. 35-1, 35-3.) On June 7, 2012, the PTO granted CSI's request for *ex parte* reexamination of the patents and as a result, it rejected all of the claims in the patents in March 2013. (Docs. 28, 44-5.) Verco submitted an after-final Request for Reconsideration, resulting in the PTO issuing reexamination certificates for the '932 and '469 Patents in May and June 2013. (Docs. 31, 32, 44-5.) The reconsideration of the reexamination of the '932 device patent found it patentable but only with amendments to the language of Claim 1. (Doc. 32-1.) The other claims of the '932 Patent were not amended but are dependent on the amended claim. (*Id.*) The reconsideration of the reexamination of the '469 method patent resulted in confirmation of all of its claims without amendment. (Doc. 32-2.)

The parties agree that the term "louver" must be construed. Verco accuses CSI's tool of infringing at least Claims 1, 5, and 6 of the '932 Patent, and Claims 12, 13, and 15 of the '469 Patent. (Doc. 65-1.) Claim 1 of the '932 Patent and Claim 12 of the '469 Patent are independent claims, each requiring the formation of a "louver" in the seam of the joined steel decking workpieces. Claims 5 and 6 are dependent on Claim 1 of the '932 Patent, and Claims 13 and 15 are dependent on Claim 12 of the '469 Patent. Therefore, a "louver" is a necessary element of every disputed claim of both the '932 and '469 Patents. The parties propose the following constructions:

> **CSI's Proposed Construction of "LOUVER":**
> a rectangular structure formed in the multiple layers of steel comprising the seam of adjacent connected panels of steel decking, said rectangular structure having lateral edges sheared from the seam and deformed into a bowed shape supported at two ends orthogonal to the lateral edges, with

>said bowed structure bridging the window formed by the lateral sheared edges in the adjacent layer of steel in the seam.
>
>**Verco's Proposed Construction of "LOUVER":**
>a tab formed by the shearing and deforming of a portion of a seam of structural steel decking that provides interference at the ends of the tab to resist lateral movement of adjacent panels of structural steel decking.

(Doc. 65 at 4.)

## DISCUSSION

### I. Legal Standard

A patent includes two basic components: (1) a written description of the invention, which is referred to as the "specification" of the patent, and (2) the patent claims. The claims of a patent define the scope of the invention to which the patentee is entitled. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The purpose of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996). Claim construction is exclusively within the province of the court. *Markman*, 517 U.S. at 372.

When construing a patent's claims, the words of a claim are generally given their ordinary and customary meaning. *Phillips*, 415 F.3d at 1312. The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, read "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. Claims should be considered as a whole, and terms used in multiple claims should be construed consistently. *Inverness Med. Switz. BmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (2002).

When construing the claims, the Court should look first and primarily to the intrinsic evidence of the patent, which includes the claims, specification, and prosecution

history. *Phillips*, 415 F.3d at 1313. The claims can provide substantial guidance by showing how the disputed words are used in context. *Id.*

The specification is the primary basis for claim construction and the best source for understanding a technical term in the proper context. *Id.* at 1315. The specification may narrow the scope of a disputed claim term if the patentee has "demonstrate[d] intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012), (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)). In ascertaining whether the patentee has disavowed the full scope of a claim, the Court must not read limitations from the specification into the claims. *Teleflex*, 299 F.3d at 1326 (citing *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998)). In other words, the claims are not necessarily limited to the embodiments disclosed in the specification. *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985) (en banc).

In addition to the specification and the claims themselves, the Court should also consider the patent's prosecution history, although it can be less useful. *Id.* at 1317. "The purpose . . . is to 'exclude any interpretation that was disclaimed during prosecution.'" *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (citation omitted). The prosecution history may reveal that the patentee "has unequivocally disavowed a certain meaning to obtain [its] patent." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. Thus, the Court examines both the specification and prosecution history to ascertain whether the patentee has disavowed the full scope of a claim term.

Extrinsic evidence may also be used to assist the court's claim construction.

Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, learned treatises, and other patents. *Phillips*, 415 F.3d at 1317. Although extrinsic evidence can shed useful light it is less significant than the intrinsic record. *Id.* Extrinsic evidence must not be used to vary or contradict claim terms. *Vitronics*, 90 F.3d at 1584.

## II.     Construction of Disputed Term.

The issue before this Court is the meaning of the term "louver" as it is used in the patents in suit. The parties are in agreement that the term should be interpreted consistently across the different claims of the two patents because both patents share a common specification and arose out of the same initial prosecution. CSI proposes a longer and more detailed construction, while Verco's proposed construction is brief and more general. For the following reasons, the additional details proposed by CSI are inappropriate, and the Court therefore adopts Verco's proposed construction.

### A.     Claims

Starting with the intrinsic evidence, the way the term "louver" is used in the various claims does not suggest that it always has the detailed meaning that CSI proposes. CSI proposes that a "louver" always means a structure that is rectangular, bow-shaped, connected at both ends, and bridges the window formed in the seam. If louver always meant such a specific structure, then those details would automatically be a part of all of the dependent and independent claims, and there would be no purpose in specifying them.

However, the various claims include different combinations of those details, suggesting that they are only requirements of the louvers within the specific claims that mention them. For example, the independent Claim 1 of the '469 Patent provides for the formation of "end-supported louvers" but does not include the other details suggested by CSI. Claim 2 is dependent on Claim 1 and it does list all of those more specific requirements of a louver. In dependent Claim 4, the generic louvers from independent Claim 1 are explained to be rectangular with opposing sides attached. There is no purpose

in specifying those details in dependent Claim 2 and only some of them in dependent Claim 4 if a person of ordinary skill in the art would already understand those details to be the ordinary and customary meaning of louver from the independent Claim 1. Similarly in the '932 Patent, the independent Claim 1 provides no details about the louvers, while the dependent Claim 2 clarifies that in that claim the louvers must be rectangular with two opposing sides remaining attached.

CSI's proposal is also contrary to the claim differentiation cannon of construction which states that the all of the claims of the patent should be given independent meaning. *See SanDisk Corp. v. Kingston Tech. Co., Inc.*, 695 F.3d 1348, 1361 (Fed. Cir. 2012). "Where, as here, the sole difference between the independent claim and the dependent claims is the limitation that one party is trying to read into the independent claim, 'the doctrine of claim differentiation is at its strongest.'" *Id.* (quoting *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)); *see also Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not in the independent claim."). The only purpose of dependent Claim 2 of the '469 Patent is to specify that the louver formed has the specific details of being a rectangular tab that is bowed, supported on both ends, and bridges the window. There would be no independent meaning or purpose for this dependent claim if those details were already required of the louver in the independent Claim 1.

CSI argues that Verco's proposed construction as a mere "tab" is general and imprecise. However, interpreting the word louver as a specific kind of tab is consistent with the way that the word louver is used in the claims. Claim 2 of the '469 Patent describes forming a louver in terms of shearing a tab out of the walls that remains attached on two sides and then "deforming the rectangular tab into a bowed louver." In this claim the drafter shows that the louver is created by shearing a tab out of the metal and forming that tab into a louver. The drafter uses the term louver as a specific kind of tab, and therefore it is appropriate to construe the word louver to mean a tab with specific

characteristics and purposes as Verco has proposed.

### B. Specification

The specification is the most significant form of intrinsic evidence and it also supports Verco's proposed interpretation. CSI points to language in the specification which provides that the "tab or louver" should be rectangular, bow shaped, supported on the ends, and bridge the window. *See* '932 Patent, Col. 5, lines 34–40. This part of the specification is describing a specific embodiment of the claimed invention and it therefore provides details about how that particular embodiment performs the claimed functions. This includes the specific details about the louvers formed by this preferred embodiment and it includes Figures 8 and 9 which visually represent that same level of detail. However, the general rule is that the details of the specification should not be read into the claims. *See Teleflex*, 299 F.3d at 1326. CSI has not shown how Verco specifically disavowed the broader full scope of its claims by providing an example in the specification. In fact the specification emphasizes that it is describing a preferred embodiment and that the figures provide an illustrative embodiment. '932 Patent, Col. 2, line 14; '932 Patent, Col. 3, line 26. At the end of the specification, the patent emphasizes "that variations and modifications of such embodiments and methods may be made without departing from the spirit and scope of the invention" and that the invention should only be limited by the claims in accordance with principles of applicable law. '932 Patent, Col. 6, lines 21–33. Here, those applicable principles of law do not justify reading in the specific details proposed by CSI.

The use of the words louver and tab in the specification also runs contrary to CSI's argument that the word tab is too general and imprecise. The drafter's usage shows that it is proper to interpret a louver as a type of tab because the specification uses those two words interchangeably in the phrase "tab or louver."

### C. Prosecution History

CSI makes several arguments about why the prosecution history supports its more specific definition of a louver. Its major argument is that Verco was forced to amend and

limit the scope of its patent, and the meaning of the term louver, during the reexamination and response process. In fact, none of the claims in the '469 Patent were amended, and only the first claim of the '932 Patent was amended. In that amendment, no words were deleted. The two added phrases only clarify that the louver is made in the seam and define what constitutes the seam. On the face of these amendments, it does not appear that Verco disavowed or limited the scope of the term louver.

CSI's next contends that the arguments made by Verco during reexamination show that it narrowed the meaning of louver. CSI quotes from declarations that Verco submitted with its Response to Final Rejection. These declarations were made by experts who supported Verco's position that the patents should not have been rejected as obvious in light of previous inventions. (Doc. 65-3.) The Federal Circuit recently reemphasized that "it is particularly important not to limit claim scope based on statements made during prosecution" unless there has been a clear disavowal or contrary definition." *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1276 (Fed. Cir. 2012). Here, the fact that Verco included these declarations as supporting material and quoted from them does not demonstrate that it made a clear disavowal or contrary definition of the term louver. As discussed above, the specification and some of the claims do describe more specific types of louvers. The fact that the experts mentioned some of those specifics is not remarkable and does not indicate that these are the only kinds of louvers covered by the language of the patents.

CSI also argues that Verco "expressly defined" a louver "as having the definitions set forth in the Abstract and Specification of the '469 and '932 Patents." (Doc. 65 at 11.) CSI initially provided no citation for this claim, but with its reply, it submitted interview summaries prepared by the PTO employee who conducted the reexaminations of the patents. Those brief summaries indicate that when asked if the specification defined the louver, the representative for Verco "pointed to the Abstract for a definition." (Doc. 75-1 at 4; Doc. 75-2 at 4.) The summaries indicate that there were also questions about where the louvers were formed and whether they were a claim limitation or a functional

- 8 -

limitation. These summaries are not direct quotes and they appear to indicate the kind of back and forth between examiner and patentee that cannot be relied upon with the same certainty as the result of those negations. *See Phillips*, 415 F.3d at 1317.

Here, the abstract does give a more specific description of a louver. It provides that "[t]he louver comprises a sheared portion in the form of a bowed tab bridging a corresponding window formed in the seam by the shearing of the tab." '469 Patent, Abstract; '932 Patent, Abstract. Although a patent's abstract section can be used by courts in claim construction, *Hill-Rom Co., Inc. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 (Fed. Cir. 2000), it is important to remember that it "must be as concise as the disclosure permits, preferably not exceeding 150 words in length. The purpose of the abstract is to enable the Office and the public generally to determine quickly from a cursory inspection the nature and gist of the technical disclosure." 37 C.F.R. § 1.72(b). As discussed, there are claims within the patents that do indicate that the louver covered by those claims should have certain specific characteristics, but other claims do not have such limiting language. The abstract should only be 150 words in length and in this case it is precisely that length. The drafter is only allowed enough words to give the "gist" of the invention in a way that anyone can "determine quickly from a cursory inspection." Here, the Abstract is best understood as a summary of the preferred and illustrative embodiment described in the specification. It does not purport to and as a practical matter cannot describe the full scope of all of the claims of the patent. Even if Verco's representative made some indication that the Abstract provided a definition of a louver, that is not the kind of clear disavowal needed to restrict the language of the claim.

Next, CSI argues that the examiner adopted some of these more detailed descriptions of a louver in issuing the reexamination certificates. If the examiner had incorporated limitations into its explanation, it might have indicated that Verco had in fact limited the meaning of the term louver. Here, the examiner did not do that. The examiner's Statement of Reasons for Patentability and/or Confirmation actually includes primarily verbatim quotes from the claim language of patents. (*Compare* Doc. 65-4 at 6,

*with* '469 Patent, Claim 1; *Compare* Doc. 65-5 at 6, *with* '932 Patent, Claim 1, *as amended by Ex Parte* Reexamination Certificate (Doc. 35-2).) As such, the examiner's statements provide no basis for narrowing the scope of the quoted claim language.

### D. Prior Art References

CSI's final argument is that the Court should look at figures from various patents and construe the term louver so that it means something different than what is depicted in those images. CSI's general contention is that Verco's proposed definition is too broad and would cover too many types of tabs. But Verco's proposed construction does not define a louver as a mere tab. It defines a louver as a tab that is created by a specific action, in a specific location, and for a specific purpose.

CSI acknowledges that the Federal Circuit only requires claims to be construed to protect their validity where the claim language is still ambiguous after using all other methods of claim construction available. *See Phillips*, 415 F.3d at 1327. Here there is no reason to do so because CSI does not allege that there is ambiguity after applying the other claim construction methods addressed above.

Even if the Court did find ambiguity to be resolved, CSI would have to establish that Verco's proposed language might cause invalidity. Simply reproducing figures from various patents does not provide this Court with a sufficient invalidity argument to merit consideration. The patent at issue is not a design patent, and CSI has not demonstrated or argued how the elements of the claims in the patents in suit relate to the elements of the claims in the depicted patents.

Furthermore, even if all of the figures CSI reproduced show tabs that could be a louver as interpreted in this order that does not establish invalidity. Here, Verco has not patented a louver itself as a stand-alone invention, but rather a device and a method for creating louvers. CSI has not described the devices or methods covered by the patents it references or specified the basis on which the patents in suit might be found invalid. The Court will not search the full version of those patents that are attached as exhibits looking for such an argument.

### E. Sealed Portions of Verco's Motion

Verco submitted both a redacted unsealed version of its Response and an unredacted full version under seal. (Docs. 73, 94.) In the unsealed version of its Response, Verco argues that "CSI needed a tool to compete with Verco." (Doc. 73 at 2.) The rest of the sealed language in the introduction, and the supporting sealed exhibits only provide more details along that general theme. These facts about CSI's competition with Verco are immaterial to how a person of ordinary skill in the art would understand the word "louver" as used by the patents in suit.

Similarly, the sealed portions that allege that CSI's representative made certain admissions during a deposition also do not provide persuasive evidence about how the word "louver" was used in the patent. In this Order, the Court is only providing construction of the terms of the claims which is a matter of law. It is not determining anything regarding CSI's conduct, motives, intentions, or admissions at this stage. Therefore, none of the sealed language in Verco's Unredacted Motion is persuasive in establishing the proper construction of the term louver.

**IT IS HEREBY ORDERED** that the term "louver," as used in the claims of United States Patents numbers 6,212,932 and 6,397,469, is construed to mean "a tab formed by the shearing and deforming of a portion of a seam of structural steel decking that provides interference at the ends of the tab to resist lateral movement of adjacent panels of structural steel decking."

**IT IS FURTHER ORDERED** granting in part and denying in part the Third Motion for Extension of Time to Complete Discovery (Doc. 97) contained in this Court's July 11, 2013 Case Management Order (Doc. 42), as subsequently modified at Doc. 87 and 96, as follows:

1. Initial Expert Disclosures: **September 8, 2014**
2. Deadline for Engaging in Good Faith Settlement Talks: **September 19, 2014**
3. Rebuttal Expert Disclosures: **October 6, 2014**

4. Last Day for Expert Depositions: **October 31, 2014, 2014**

5. Dispositive Motion Deadline: **November 21, 2014**

Dated this 8th day of August, 2014.

*A. Murray Snow*
G. Murray Snow
United States District Judge